[Crim. No. 18597. First Dist., Div. Three. Jan. 24, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY WILLIAM BURRES, Defendant and Appellant.

**COUNSEL**

John Kappos and Kappos & Williams for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert W. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FEINBERG, J.**—Defendant Timothy Burres was charged by information with two counts of assault by means of force likely to produce great bodily injury upon the person of a peace officer (Pen. Code, § 245, subd. (b)). A jury acquitted him of count I (relating to Officer Leon Williamson) and found him guilty of count II (relating to Officer Michael Korbett).

About two months prior to the events at issue, Officer Leon Williamson, a Rio Vista police officer, arrested appellant, a 19-year-old local resident, for a traffic offense. Appellant was not permitted to testify at trial as to whether Williamson used force in arresting him on that occasion, but was permitted to state that he was afraid of Williamson, without giving any reasons therefor. Upon returning to his car on the day following his arrest, appellant found that it had been damaged; appellant treasured his car more than any other item he owned.

On the occasion at issue, January 29, 1978, Officer Williamson stopped appellant for a traffic offense, took his car keys, and told appellant to have his parents collect the keys at the police station. Because of the damage done to his car on the prior occasion, appellant went home and secured a second set of keys.

Williamson was informed that the car was moving. He testified that as he approached the area where it had been parked, he saw appellant's oncoming car swerve into his lane, forcing him to drive to the edge of the pavement to avoid a collision. Appellant testified that he dropped his cigarette and, in the process of retrieving it, swerved into the opposing lane, but that he brought the car back into his own lane before there was any danger of a collision.

Williamson made a U-turn and began to pursue appellant. Appellant first attempted to "ditch" Williamson, but stated that he changed his mind and stopped his car. Conflicting testimony was offered as to whether Williamson then rammed appellant's car, or vice versa. Testifying for the defense, a mechanical engineer and expert in accident reconstruction analyzed the damage done to both cars and concluded that Williamson unquestionably had rammed appellant while appellant's car was stopped.

Appellant drove off again, making a series of U-turns, and made two "passes" at the police vehicle. Appellant testified that on both occasions, he intended only to frighten Williamson. When appellant made the second "pass," Williamson fired four shots at him.

Officer Michael Korbett then began to pursue appellant in a second police car. Korbett testified that at one point appellant was driving on the wrong side of the road, near the curb, directly towards him, and

that he was obliged to drive onto the sidewalk to avoid a head-on collision. An eyewitness confirmed this account. Appellant testified that he had no recollection of the incident.

Williamson fired twice more at appellant. Appellant drove out of town, avoided capture, and later turned himself in to the police.

Appellant stated that he was not aware that Williamson had shot at him on the first occasion, but realized that he was under fire on the second occasion because his side window was shot out. He testified that he had no recollection of events from that point on until he started walking home from the field where he left his car. Appellant further stated that he never realized that Korbett was involved in the chase, but thought that he was being pursued by Williamson alone.

Appellant raises five questions on appeal relating to jury instruction.

### 1. *Intent to Commit Battery*

█ Under Penal Code section 240, an assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another. Thus, an assault is an attempt to commit a battery. (*In re James M.* (1973) 9 Cal.3d 517, 521-522 [108 Cal.Rptr. 89, 510 P.2d 33]; *People v. Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372]; *People v. Lathus* (1973) 35 Cal.App.3d 466, 470 [110 Cal.Rptr. 921]; 1 Witkin, Cal. Crimes (1963) § 255, p. 241.)

█ The intent necessary to commit an assault is the intent to commit battery. (*People v. Rocha, supra,* 3 Cal.3d at p. 899.) █ Mere reckless conduct is not sufficient to constitute assault. (*Id.,* at p. 898; *People v. Hood* (1969) 1 Cal.3d 444, 452-458 [82 Cal.Rptr. 618, 462 P.2d 370]; *People v. Carmen* (1951) 36 Cal.2d 768, 775-776 [228 P.2d 281].) █ Further, a conviction for assault may not be grounded upon intent only to frighten. (*People v. Marceaux* (1970) 3 Cal.App.3d 613, 618 [83 Cal.Rptr. 798].) █ Whether the requisite intent existed is a question for the jury. (*People v. Carmen, supra,* 36 Cal.2d 768, 776.)

█ The court instructed the jury on the elements of assault with force likely to produce great bodily injury, including intent to commit

the crime; the court did not instruct specifically on the requisite intent. At the request of the prosecution, the court instructed the jury that "When an act inherently dangerous to others is committed with a conscious disregard of human life and safety the intent to commit a battery is presumed."

In support of the instruction, the prosecution cited *People* v. *Lathus*, *supra*, 35 Cal.App.3d 466 and *People* v. *Martinez* (1977) 75 Cal. App.3d 859 [142 Cal.Rptr. 515]. The prosecution also pointed out that *People* v. *Lathus* was noted in the comment to CALJIC No. 9.03 (1971 rerevision, 1976 pocket supp.) p. 161.[1] At oral argument respondent cited *People* v. *Bedolla* (1979) 94 Cal.App.3d 1 [156 Cal.Rptr. 171] as further authority for the instruction.

We begin our analysis with the obvious—the distinction between a presumption and an inference.

Section 600 of the Evidence Code defines a presumption and an inference as follows: "(a) A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. A presumption is not evidence. (b) An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action."

We now examine the three cases cited above and relied upon by respondent.

In *Lathus*, appellant was charged with and convicted of assault with a deadly weapon (Pen. Code, § 245, subd. (a)). The evidence showed that appellant, in a moving vehicle on a highway, fired several pistol shots at a car parked on the shoulder of the highway. A person standing outside and adjacent to the car was hit; a tire of the car was also hit.

---

[1]The comment, which also appears in the fourth edition (1979), reads as follows: "The requisite intent for the commission of an assault with a deadly weapon is the intent to commit a battery. Reckless conduct, alone, does not constitute a sufficient basis for assault or for battery even if the assault results in an injury to another. However, when an act inherently dangerous to others is committed with a conscious disregard of human life and safety, the act transcends recklessness, and the intent to commit a battery is presumed."

The defense was that appellant had not seen any person near the car and that he had not intended to shoot anyone.

The issue on appeal was whether there was *substantial evidence* to support the verdict.

Under the evidence, as the *Lathus* court pointed out, the jury could have reasonably found that appellant had "deliberately shot at the parked automobile with actual knowledge that there were people in or near it." (35 Cal.App.3d at p. 471.)

It is true that the court in *Lathus* said at page 470: "However, when an act inherently dangerous to others is committed with a conscious disregard of human life and safety, the act transcends recklessness, and the intent to commit the battery is presumed; the law cannot tolerate a deliberate and conscious disregard of human safety. Thus, if one deliberately employs a lethal weapon, such as a gun, with actual or presumptive knowledge that if utilized in the manner in which it is being used the infliction of serious bodily injury to another is very likely to occur, he is presumed to have intended the natural consequences of his deliberate act."

But *Lathus* did *not* involve an instruction of law, i.e., in our context, a *presumption*, but rather an *inference* that a jury could reasonably draw from the evidence. From the evidence in *Lathus*, it would appear reasonable to *infer* that appellant intended to commit a battery. The jury did not have to believe his testimony to the contrary.

Thus, *Lathus* did not address itself to the issue of the effect of a presumption in a criminal case.

Similarly, in *People* v. *Martinez, supra,* 75 Cal.App.3d 859, the case came before the court on the People's appeal from the trial court's order granting a Penal Code section 995 motion to dismiss. Martinez was charged with a violation of Penal Code section 245, subdivision (b). The evidence at the preliminary examination showed that several policemen were at the scene of a disturbance on the streets when Martinez, carrying a brown bottle "crouched down in a 'military' or 'hand grenade stance' and threw the bottle." (*Id.*, at p. 862.) The bottle bounced off a police car and struck an officer. At the time Martinez threw the bottle, his view of the officer struck was unobscured.

The Court of Appeal held that the evidence generated sufficient cause under Penal Code section 872 to warrant holding Martinez to answer.

Again, the issue of the effect of a presumption was not before the court but rather the issue was one of drawing an inference.

We address now *People* v. *Bedolla, supra*, 94 Cal.App.3d 1. Bedolla was convicted of Penal Code section 245, subdivision (a)—firing revolver shots from a motorcycle at the occupants of another vehicle, which occupants had shortly before been challenged to fight by Bedolla.

Bedolla had no license or permit to carry the firearm. In accordance with Penal Code section 12023, the trial court instructed: "'When a person has been charged with committing a felony such as assault with a deadly weapon against the person of another while armed with a pistol, revolver, or other firearm capable of being concealed upon the person, without having a license or permit to carry such firearm, *the fact that he was so armed shall be prima facie evidence of his intent to commit the felony if such weapon was used in the commission of the offense.*'" (*Id.*, at p. 5.) The trial court then instructed that prima facie evidence was "'such evidence as is sufficient to establish a fact constituting a party's claim, and which if not rebutted or contradicted, will remain sufficient.'" (*Ibid.,* fn. omitted.)

The *Bedolla* court held that section 12023 created a rebuttable presumption of intent but that the presumption violated due process because it could not be said with "'*substantial assurance* that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend,'" citing *Leary* v. *United States* (1969) 395 U.S. 6, 36 [23 L.Ed.2d 57, 82, 89 S.Ct. 1532]. (*Ibid.*)

In other words, the *Bedolla* court said, "There is no substantial assurance that a person who is accused of committing a felony with an unlicensed concealable weapon is more likely to have the requisite intent to commit the crime than an accused who used a properly licensed weapon." (*Ibid.*, fn. omitted.)

Though the error was of constitutional dimension, the court then concluded that, beyond a reasonable doubt, it was harmless.

In this aspect of *Bedolla*, the case is not relevant to our inquiry, as we shall explain further below, because the issue decided was the validity of the presumption, not the effect of a valid presumption.

However, the *Bedolla* court went on to say that, in the absence of a request therefor by the defendant, an instruction on criminal presumptions need not be qualified by informing the jury as to the effect of the presumption so long as the jury was properly advised "on the reasonable doubt standard as to the entire case." (*Id.*, at p. 9.)

This holding of the court would appear to be directly relevant to the case at hand. We respectfully suggest, however, that, in this aspect, the case lacks precedential value for two reasons:

1. It is difficult to understand why the court felt constrained to decide whether it was error to fail to give an explanatory instruction as to the limited effect of a presumption when the court had held the presumption itself to constitute constitutional error though harmless beyond a reasonable doubt; thus the holding would appear to be a dictum; and

2. Two cases, *Ulster County Court* v. *Allen* (1979) 442 U.S. 140 [60 L.Ed.2d 777, 99 S.Ct. 2213] and *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], the former decided a few days before *Bedolla* and the latter a few days after *Bedolla*, cast a new light on the use of presumptions in criminal cases.

We discuss the *Sandstrom* case first because it is directly on point.

Sandstrom was charged with "'deliberate homicide'" in that he "'purposely or knowingly caused the death of Annie Jessen.'" (*Id.*, at p. 512 [61 L.Ed.2d at p. 43, 99 S.Ct. at p. 2453].) He admitted the homicide but denied that he had done so "'purposely or knowingly.'" His defense was that he suffered from a personality disorder aggravated by alcohol consumption.

At the request of the prosecution, the trial judge instructed the jury that "'The law presumes that a person intends the ordinary conse-

quences of his voluntary acts.'"[2] (*Ibid.*) The trial judge gave no instructions as to the effect of the presumption. Thus, the state had only to prove that the homicide was the ordinary consequence of a voluntary act and the intent to commit the homicide would be "presumed."

The Montana Supreme Court had held that the effect of the presumption was *not* to shift any burden of persuasion to the defendant but only to require the defendant to adduce *some* evidence that he did not intend the ordinary consequences of his voluntary act. Thus, the Montana Supreme Court held that the instruction did not violate due process standards and affirmed the conviction. (*State* v. *Sandstrom* (1978) 176 Mont. 492 [580 P.2d 106].)

The United States Supreme Court granted certiorari and reversed.

The high court's analysis proceeded as follows: First: Determine the nature of the presumption. That is to be determined by the words actually used in instructing the jury "for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." (442 U.S. at p. 514 [61 L.Ed.2d at p. 45, 99 S.Ct. at p. 2454].) Thus, even though the Montana Supreme Court had held that the effect of the presumption was to require that the defendant produce only *some* evidence to show a lack of the requisite intent, the jury was not so instructed. The jury was not even told that the intent *may* be presumed; it was told without any limitations that "'the law presumes.'" (*Id.*, at p. 517 [61 L.Ed.2d at p. 46, 99 S.Ct. at p. 2455].)

So a reasonable jury *could* have interpreted the presumption to be conclusive or it could have interpreted the presumption as requiring the defendant, by some quantum of proof, greater than simply producing "'some'" evidence, to adduce evidence dispelling the existence of the requisite intent thus effectively shifting the burden of persuasion as to intent. (*Id.*, at p. 517 [61 L.Ed.2d at pp. 46-47, 99 S.Ct. at p. 2456].)

Second: Because the jury *could* have so interpreted the instruction, the next step in the court's analysis dealt with the question as to whether as so interpreted the presumption was constitutional.

---

[2]"Intent" was equated with "purposely or knowingly." (*Id.*, at p. 521, fn. 11 [61 L.Ed.2d at p. 49, 99 S.Ct. at p. 2458].)

The due process clause of the Fourteenth Amendment requires the state to prove beyond a reasonable doubt every fact necessary to constitute the crime with which a defendant is charged in order to obtain a conviction. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].)

Intent is a necessary fact to constitute the crime of which Sandstrom was convicted. Thus, the state had to prove that fact beyond a reasonable doubt.

Where the effect of a presumption is to take from the jury the determination of that necessary fact, beyond a reasonable doubt, as in the case of a conclusive or irrebutable presumption or when the effect of a presumption is to shift the burden of proof as to a necessary fact from the prosecution to the defendant, in either case, the court held, the presumption is unconstitutional as invading the overriding presumption of innocence and diminishing the burden of proof cast upon the prosecution by the due process clause of the Fourteenth Amendment.

It is instructive now to compare *Ulster County Court* v. *Allen, supra,* 442 U.S. 140, decided two weeks before *Sandstrom.*

In *Allen,* the issue was a statutory presumption but the case turned on the question of whether there was a rational connection between the proved fact and the presumed fact so that more likely than not the presumed fact was true. But the court, at considerable length, explicated the distinction between a mandatory and permissive presumption pointing out that the trial judge in *Allen* made it clear to the jury that "the presumption was merely a part of the prosecution's case, that it gave rise to a permissive inference available only in certain circumstances, rather than a mandatory conclusion...and that it could be ignored by the jury even if there was no affirmative proof offered by defendants in rebuttal." (*Id.,* at pp. 160-161 [60 L.Ed.2d at p. 794, 99 S.Ct. at pp. 2226-2227].) *Sandstrom* refers to *Allen* in pointing out that the nature of the presumption is to be determined by what precise words the jury was instructed. (*Sandstrom* v. *Montana, supra,* 442 U.S. 510, 514 [61 L.Ed.2d 39, 45, 99 S.Ct. 2450, 2454].)[3]

---

[3]In the light of *Sandstrom,* we raise the question of the validity of Evidence Code section 607.

Assuming there is no evidence to rebut the presumption as to the existence of a fact essential to establish guilt, can a trial judge instruct the jury that it *should* find the presumed fact if it finds, beyond a reasonable doubt the facts giving rise to the pre-

Applying the *Sandstrom-Allen* cases, it is obvious that the case at bench falls within the ambit of *Sandstrom.* Here, as in *Sandstrom,* the trial court instructed the jury that "When an act inherently dangerous to others is committed with a committed—committed with a conscious...disregard of human life and safety *the intent to commit a battery is presumed."* (Italics added.) The jury was not instructed at all as to the effect of the presumption.

Here, as in *Sandstrom,* the jury *could* have taken the presumption as irrefutable or casting upon appellant the burden of proving the lack of intent to commit a battery.

Here, as in *Sandstrom,* the intent to commit a battery is a necessary element of the offense charged—assault with a deadly weapon.

It is true that the trial court here instructed the jury that "The intent with which an act is done is shown by the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act." But no one can say whether the jury drew an inference that the intent to commit a battery existed or whether the jury relied on the presumption. However, "[i]t has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside." (*Leary* v. *United States* (1969) 395 U.S. 6, 31-32 [23 L.Ed.2d 57, 79, 89 S.Ct. 1532]; it is to be noted that *Leary* involved a statutory presumption; *Sandstrom* v. *Montana, supra,* 442 U.S. at pp. 525-526 [61 L.Ed.2d at p. 52, 99 S.Ct. at p. 2460].)

We conclude that the giving of the challenged instruction constitutes federal constitutional error.[4]

Our inquiry, however, is not ended. Is the error reversible per se or is it to be measured by the *Chapman* standard, i.e., beyond-a-reasonable

---

sumption as the comment by the Assembly Committee on Judiciary to section 607 states?

Further, if the facts giving rise to the presumption of an essential fact have been proven beyond a reasonable doubt, can the defendant be required to adduce evidence to raise a reasonable doubt as to the existence of the presumed fact, as section 607 seems to demand, for would this not be a shifting of the burden of proof from the prosecution's burden of proving the presumed fact beyond a reasonable doubt back to the defendant, making him adduce sufficient proof to raise a reasonable doubt of the existence of the presumed fact?

[4]We make it explicit that we are *not* holding that the presumption, per se, is invalid. For the purpose of our exposition, we have assumed that there is a "rational connection" between the basic facts proven and the presumed fact.

doubt, the error was harmless? (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

*Sandstrom* left the question open on the ground that the Montana Supreme Court had not considered it and therefore the court in *Sandstrom* declined to consider it "as an initial matter here." (*Sandstrom* v. *Montana, supra*, at p. 527 [61 L.Ed.2d at p. 53, 99 S.Ct. at p. 2461].)

We are of the view that the error is reversible per se. We reason as follows:

In *Jackson* v. *Virginia* (1979) 443 U.S. 307, 316 [61 L.Ed.2d 560, 571, 99 S.Ct. 2781, 2788], the United States Supreme Court held that "an essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."

The *Jackson* court hypothesized that if a jury were instructed that proof by a preponderance of the evidence was sufficient to convict, even though proof of guilt had been overwhelming, such a conviction would be a denial of due process. (*Id.*, at p. 320, fn. 14 [61 L.Ed.2d at p. 574, 99 S.Ct. 2790].) In other words, such error would be reversible per se.

The *Sandstrom* court held that the error of giving an instruction on a presumption as to an essential fact without qualification as to the effect of the presumption was to invade the presumption of innocence and dilute the prosecution's burden of proof.

Reasoning from *Sandstrom* to *Jackson*, it would seem to follow that *Sandstrom* error is reversible per se.

But even if the error is to be measured by *Chapman* standard, it is reversible error, for our reading of the record convinces us that we cannot say, beyond a reasonable doubt, that the error was harmless.

We now address issues which do not require reversal but which are likely to arise on retrial.

## 2. *Restriction of Appellant's Explanation of His Flight*

■ Appellant complains that the jury was instructed on flight, but that he was not permitted to describe his prior encounter with Williamson, thereby explaining his flight. Penal Code section 1127c makes mandatory the giving of an instruction on flight where, as here, evidence of flight is relied upon as tending to show guilt. (*People v. Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585].) Flight is relevant only insofar as it may demonstrate consciousness of guilt. (*People v. Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586].) Thus, even if appellant's flight was justifiable, the instruction was properly given. While the instruction might have been framed to indicate more clearly to the jury its obligation to consider appellant's explanation of his flight (*People v. Hinshaw* (1924) 194 Cal. 1, 26-27 [227 P. 156]), an instruction such as the one given here has been held to leave the question of justification to the jury (*People v. Cannady, supra*; *People v. Daener* (1950) 96 Cal.App.2d 827, 833 [216 P.2d 511].)

It was error for the court not to permit appellant to present the facts of his prior encounter with Officer Williamson. (*People v. Zammora* (1944) 66 Cal.App.2d 166, 225 [152 P.2d 180]; *People v. Anderson* (1922) 57 Cal.App. 721, 727 [208 P. 204].) The jury may have believed appellant's testimony that he thought Korbett was Williamson, in which case evidence of the prior encounter would have tended to show that there was a reason for him to flee other than consciousness of guilt.

## 3. *Excessive Force Instructions*

Appellant complains that a series of instructions having to do with use of excessive force by Officer Williamson in effecting arrest were improperly refused.

Appellant's contention that excessive force instructions should have been given has merit, but only as to count I. ■ An officer may lawfully use only *reasonable* force to make an arrest or to overcome resistance. (Pen. Code, § 835a; *People v. Curtis* (1969) 70 Cal.2d 347, 357 [74 Cal.Rptr. 713, 450 P.2d 33]; *People v. Booher* (1971) 18 Cal. App.3d 331, 335 [95 Cal.Rptr. 857].) The question of the exercise of reasonable force is one for the jury to determine. (*People v. Curtis, supra*, at p. 359.) ■ Use of excessive force by a peace officer is a defense to violation of Penal Code section 245, subdivision (b) because

it takes the peace officer outside the scope of his duties. (*Id.*, at pp. 357-358, fn. 9.)

As to count II, there was no evidence that Officer Korbett used excessive force in attempting to arrest appellant. Korbett was acting as a peace officer, regardless of whether appellant thought that Korbett was Williamson. Such instruction was, therefore, not applicable as to count II.

### 4. *Lesser and Included Offenses*

■ The trial court had a duty to instruct as to all lesser and included offenses, if any existed, which could be supported by the evidence. (*People* v. *Hood, supra,* 1 Cal.3d at p. 450.) However, with respect to count II, there was no evidence that Officer Korbett used excessive force; therefore, an instruction on Penal Code section 245, subdivision (a) would have been inappropriate.

■ Appellant contends that the court should have instructed the jury on the lesser and included offenses of simple assault (Pen. Code, § 241) and assault upon a peace officer (Pen. Code, § 241.4). With respect to count II, no instruction on Penal Code section 241 was required because there was no evidence that Korbett was acting outside the scope of his authority. No instruction on Penal Code section 241.4 was required; either appellant was guilty of assault by means of force likely to produce great bodily injury or he was not guilty of assault at all.

■ Appellant also contends that the jury should have been permitted to decide whether he was guilty only of a misdemeanor violation of section 245, subdivision (b), a "felony-misdemeanor." Whether appellant was guilty of a misdemeanor or a felony was not a question for the jury (Pen. Code, § 17, subd. (b)); the court did not err in refusing the requested instruction.

### 5. *Special Findings*

■ Appellant contends that the court erred in not allowing the jury to make special findings. No party has a right to submission of special findings; the procedure is discretionary with the court, and a showing of abuse of discretion is necessary to make the refusal of a request reversible error. (*Olmstead* v. *Dauphiny* (1894) 104 Cal. 635, 641 [38 P. 505]; *Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal.

App.3d 1, 11-12 [135 Cal.Rptr. 170]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 267, pp. 3075-3076.) In the absence of a showing of abuse of discretion, the court did not err in refusing to submit special findings to the jury.

The judgment is reversed.

White, P. J., and Scott, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 20, 1980.